IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

BEVERLY GAY MARCUM and                                                PLAINTIFFS
BELINDA GAIL HENLY, Co-Administrators
For the Estate of Van Ryan Marcum, Deceased
and GARY VAN MARCUM

VS.                                  CASE NO. 05-CV-4011

THE SHAW GROUP, INC.                                                  DEFENDANT

## MEMORANDUM OPINION

Before the Court is Defendant The Shaw Group, Inc.'s Second Motion for Summary Judgment. (Doc. 29). Plaintiffs have responded. (Doc. 34). Defendants have replied to Plaintiff's response. (Doc. 40). The Court finds the matter ripe for consideration.

## I. BACKGROUND

This wrongful death lawsuit arises out of the fatal electrocution of United States Army Private Van Ryan Marcum on June 19, 2004 while stationed at Fort Benning, Georgia. On that day, Private Marcum had participated in a battle, march and shoot training exercise with his platoon. The battle, march and shoot ended on the Malone 14 Range of Fort Benning. Marcum's platoon had taken a break to get water and rest when Marcum sat down and leaned his back and head up against the outside of a metal latrine. Sometime prior to June 19th, the metal latrine had become energized due to corroded electrical grounding, improper bonding, faulty breakers, and a short in the latrine's wiring. When Marcum came into contact with the latrine, the circuit of the energized latrine became complete, and Marcum was fatally electrocuted.

The Estate of Van Ryan Marcum and his beneficiaries bring this lawsuit against The Shaw Group, Inc., ("Shaw") a private contractor in charge of maintenance, inspection and repairs at Fort

Benning. Shaw was to demolish the metal latrine by March 14, 2004 pursuant to a work order from the U.S. Army. On June 17, 2004, the Army and Shaw agreed to postpone the demolition of the metal latrine.

## II. SUMMARY JUDGMENT STANDARD

The standard of review for summary judgment is well established. Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed. 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed. 202 (1986). In deciding a motion for summary judgment, the Court must consider all the evidence and all reasonable inferences that arise from the evidence in a light most favorable to the nonmoving party. *Nitsche v. CEO of Osage Valley Elec. Co-Op.*, 446 F.3d 841 (8th Cir. 2006). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enterprise Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir. 1996). Genuine issues of material fact exist where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249.

Where the moving party has advanced a prima facie case, a successful summary judgment defense requires that the nonmoving party demonstrate that at trial it may be able to put on admissible evidence proving its allegations. *Robinson v. Terex Corp.*, 439 F.3d 465, 467 (8th Cir. 2006)*; JRT, Inc. v. TCBY Sys., Inc.,* 52 F.3d 734, 737 (8th Cir. 1995). Where no reasonable jury could render a verdict for the nonmovant, however, summary judgment is properly granted in favor

of a defendant. *Taylor v. White*, 321 F.3d 710, 715 (8th Cir. 2003).

<u>III. DISCUSSION</u>

From the outset, the Court notes that the parties read Shaw's Contract with the United States Army ("Army Contract") very differently. The fundamental disagreement between the parties concerns Shaw's duty, under the Army Contract, to inspect, repair and maintain the metal latrine on the Malone 14 Range at Fort Benning. Under Shaw's view, the Army only required Shaw to perform work documented in 3 forms of work orders. (Doc. 30, pg. 2). In opposition, Plaintiffs argue that Shaw's Army Contract is replete with sections creating duties on Shaw's part to inspect, repair and maintain various facilities at Fort Benning. (Doc. 35, pgs. 4-9). Interpretation of Shaw's Contract with the Army is critical in the Court's resolution of Shaw's summary judgment motion, and is a logical place for the Court to begin its inquiry.

Arkansas courts recognize that different clauses of a contract must be read together and the contract construed so that all of its parts harmonize, if that is at all possible. *Tyson Foods, Inc. v. Archer*, 356 Ark. 136, 144, 147 S.W.3d 681, 685-86 (2004); *Continental Cas. Co. v. Davidson,* 250 Ark. 35, 463 S.W.2d 652 (1971). A construction that neutralizes any provision of a contract should never be adopted, if the contract can be construed to give effect to all provisions. *Id.* (*citing Fowler v. Unionaid Life Ins. Co.,* 180 Ark. 140, 20 S.W.2d 611 (1929)). In *RAD-Razorback Ltd. Partnership v. B.G. Coney Co.,* 289 Ark. 550, 556, 713 S.W.2d 462 (1986), which concerned conflicting clauses in a contract, the Arkansas Supreme Court wrote:

> In seeking to harmonize different clauses of a contract, we should not give effect to one to the exclusion of another even though they seem conflicting or contradictory, nor adopt an interpretation which neutralizes a provision if the

various clauses can be reconciled. The object is to ascertain the intention of the parties, not from particular words or phrases, but from the entire context of the agreement.

*Id.,* (*citing Wynn v. Sklar & Phillips Oil Co.,* 254 Ark. 332, 493 S.W.2d 439 (1973). With these rules of contract interpretation in mind, the Court now considers whether Shaw's Army Contract creates a duty incumbent upon Shaw to inspect, repair or maintain the Malone 14 latrine.

### A. SHAW'S DUTY TO INSPECT, REPAIR AND MAINTAIN

As a general rule, the question of duty is one for the Court to decide, as a matter of law. *Hall v. Rental Mgmt.*, 323 Ark. 143, 913 S.W.2d 293, 296 (1996). In arguing for summary judgment, Shaw directs the Court to a single sentence from its Army Contract to deny that it had a duty to inspect, repair or maintain the Malone 14 Latrine: "Maintenance and repair tasks will be documented through Standing Operating Orders (SOOs), Service Orders (SOs), and Individual Job Orders (IJOs)." (Doc. 29, exhibit 9, pg. 4)(Contract § 5.1.1). "If a job or project is not covered by one of these three [work orders], it is not an obligation under the contract," Shaw argues. (Doc. 31, pg. 1). The rest of the Army Contract, according to Shaw, details how maintenance and repair work is to be carried out once the Army issues to Shaw one of the three types of work orders. For the reasons detailed below, the Court does not find Shaw so restrained by the these three designations of work orders.

### 1. SHAW'S ABILITY TO INITIATE WORK ORDERS

First, it is undisputed that Shaw had the ability to generate its own work orders. Shaw's ability to create and report their own SOs and IJOs is listed in sections 5.1.2.2, 5.1.2.3, and 5.1.2.5.1 of the contract. (Doc. 29, exhibit 8). Those sections state in pertinent part:

§5.1.2.2 Service Orders (SOs)

SO's represent work that is generally corrective in nature (e.g., repairs and replacements) or those related services that are not generally considered to be maintenance activities…. An SO may be initiated…by the Contractor upon identification of a need for corrective action.

§5.1.2.3 Individual Job Orders (IJOs)

IJOs represent project-oriented work such as repairs, modifications, replacements, or installations that exceed the thresholds defined above for a SO…. An IJO may be initiated by the KO, by a customer, or by the Contractor upon identification of a need for corrective action.

§5.1.2.5 Sources of Work.

Work can be identified by the KO, Units, other government personnel, tenants or residents of the installation or the Contractor. Contractor generated work is the result of requests made by operators and maintenance personnel, who identified deficiencies during inspections, preventive maintenance, or other work performance.

With Shaw thus able to generate and execute its own work orders, the question of notice becomes important. From the Deposition of Earnest Archie, Maintenance Coordinator for the Fort Benning Firing Ranges, it is apparent that Shaw repaired faulty circuit breakers and other electrical problems in several other metal latrine buildings on other ranges at Fort Benning prior to Van Ryan Marcum's death on June 19, 2004. (Doc. 34, Exhibit F, pgs. 36-40). It appears to the Court that Shaw had notice of several metal latrines having electrical problems, and the authorization to issue work orders to fix such a problem on its own initiative. Shaw routinely mentions that the evidence at this stage is "undisputed that Shaw did not perform any work on the Malone 14 latrine prior to June 19, 2004." (Doc. 40, pg. 25). Combined with Shaw's notice electrical problems in other latrines at Fort Benning, this fact suggests possible neglect by Shaw, rather than a lack of duty.

## 2. PROPER INTERPRETATION OF THE ARMY CONTRACT

Second, Shaw's interpretation of the Army Contract neutralizes sections describing Shaw's duties at Fort Benning, in violation of the interpretation principles previously outlined in *RAD-Razorback Ltd. Partnership v. B.G. Coney Co.,* 289 Ark. at 556, *supra*. The following sections of Shaw's Army Contract appear to create a duty incumbent upon Shaw to inspect, repair and maintain various structures at Fort Benning. Notably absent in any of the cited sections is a limitation of any of the following duties to work documented in an SOO, SO or IJO. An example of this language is found in § 5.2 of the Contract, which concerns buildings and structures maintenance, and includes the following sections to be performed by the Contractor (Shaw).

> 1) The contractor shall maintain and repair all buildings and structures on Ft. Benning as specified in the Contract. Buildings and structures include, but are not limited to…training facilities.
>
> (Contract § 5.2.1)  (Doc. 29, exhibit 8).
>
> 2) The contractor shall perform inspections, preventive maintenance and repair of buildings, structures and associated property and equipment encompassing a variety of trades including, but not limited to: carpentry, mechanical, floor covering, sheet rocking, plastering, plumbing, electrical, painting, metal working, roofing, structural, and masonry. Buildings and structures covered under this Functional Area include, but are not limited to, the following…training and range facilities…. The Contractor shall maintain all buildings and structures including those constructed before and during the contracting period.
>
> (Contract § 5.2.2.1)  (Doc. 29, exhibit 8).

In addition, § 5.2.3 of the Contract requires Shaw to perform the following Scheduled Tasks.

> 1) The contractor shall maintain all facilities and buildings at Ft. Benning during the contract period in a safe and operational condition as specified herein or as directed by the KO. Routine and preventive maintenance shall be performed to a standard that is highly resistant to abuse.
>
> (Contract § 5.2.3)  (Doc. 29, exhibit 8).

§ 5.2.4 of the Contract requires Shaw to perform the following Unscheduled Tasks:

> 1) The contractor shall maintain, repair and install electrical system components…in all applicable buildings, structures, and facilities….

(Contract § 5.2.4.8) (Doc. 29, exhibit 8).

> 2) Interior electric systems…The Contractor shall repair, maintain, install and test interior electric wiring and wiring systems…the contractor shall perform electrical repairs, replacements, maintenance, and testing in a manner that ensures that all electrical systems are safe and reliable. All work shall conform to the requirements for the environment in which the equipment is located.

(Contract § 5.2.4.8.6) (Doc. 29, exhibit 8).

> 3) Wiring. The contractor shall repair, maintain, install, and test interior electric wirings and wiring systems.

(Contract § 5.2.4.8.8) (Doc. 29, exhibit 8).

> 4) Building Service Entrances. The Contractor shall repair, maintain, install, and test building service entrances. Types of components include:…fittings, hardware, wiring,…grounds; grounding systems and conductors; ground rods;…circuit breakers; ground fault protection devices;….

(Contract § 5.2.4.8.12) (Doc. 29, exhibit 8).

> 5) Grounding Systems. The contractor shall repair, maintain, install and test interior electrical grounds and grounding systems. Types of components include: ground rods, grounding conductors, ground clamps…. The contractor shall check resistance levels to ensure the maximum allowable resistance of each grounding electrode is no more than 23 ohms to Earth for all types of grounding checkpoints.

(Contract § 5.2.4.8.15) (Doc. 29, exhibit 8).

> 6) Miscellaneous Responsibilities….the contractor shall ensure that electrical systems, system components, appurtenant parts, and equipment are reliable, efficient, functional, safe, and continually available for their intended purpose as specified herein.
>
>> a. The installation, maintenance, and repair of electrical wiring including…replacement of bare conductors.

> b. The operation, maintenance, repair and installation of electrical disconnects such as switches and circuit breakers; including connections; replacing tripping elements; adjusting and cleaning contents and operating mechanisms; and testing and adjusting relays….
>
> e. The installation, maintenance, and repair of conduits, ducts, and bus ways, to include checking to ensure that entrances and fittings are properly installed to prevent a means of access for moisture, dirt, oil, and other foreign material.

(Contract § 5.2.4.8.26) (Doc. 29, exhibit 8).

More specifically, § 5.11 of the Contract requires Shaw to perform maintenance on Fort Benning's numerous firing ranges. As previously indicated, Private Van Ryan Marcum was electrocuted on the Malone 14 range. Shaw is required to perform the following tasks on the ranges:

> 1) Introduction
>
> The Contractor shall perform replacement, installation, repair, and maintenance in the range facilities and areas at Fort Benning…. The Contractor shall be responsible for providing timely service and maintenance to minimize any disruption in the training mission. The Contractor shall maintain, associated range areas, range equipment, structures…

(Contract § 5.11.1) (Doc. 29, exhibit 8).

> 2) Areas Covered.
>
> Areas to be covered by the Contractor at Fort Benning include, but are not limited to, the following:
> • Range facilities
> • Latrines

§ 5.11.4 of the Contract requires Shaw to perform the following unscheduled task on the Range:

> 1) Electrical Systems. The contractor shall maintain, repair, and install electrical system components including, but not limited to, wiring systems, conduit systems, cable systems, conductors, switches, receptacles, outlets, device plates, grounds, service equipment, motor control centers, control switchboards and consoles, lighting protection systems, fixtures, kitchen and building ventilating fans, sump pumps, and electrical heaters in all applicable

buildings, structures, and facilities.

(Contract § 5.11.4.3.2) (Doc. 29, exhibit 8).

Additionally, Shaw appears to have the duty to maintain the metal latrine at Malone 14 even though it was to be demolished:

1) Facilities, Systems, and Equipment Identified for Future Replacement. The contractor shall maintain and repair equipment as outlined in this contract, unless otherwise directed by the KO regardless of whether specific facilities, systems, or equipment have been identified for future replacement by the Government.

(Contract § 5.1.1.2.10) (Doc. 29, exhibit 8).

The Court notes that Shaw's duties under the Army Contract appear carefully drafted and precisely defined. However, none of the above-cited sections mentions or cross-references the section on work order documentation through SOOs, SOs or IJOs. As a result, Shaw is asking the Court to give no effect to a number of sections of the Army Contract which appear to cover exactly the situation at issue in this case. The Court declines this invitation.

3. SHAW'S RESPONSIBILITY FOR "CRITICAL SYSTEMS"

Third, the Army Contract requires Shaw to keep certain systems within Fort Benning operational "24 hours a day, every day." (Doc. 29, Exhibit 8, pg. 17). This duty exists independently of any SOO, SO or IJO documented work assigned to Shaw. In its Reply brief, Shaw argues that this subsection, labeled "Critical Systems," falls within the broader section of "Contingency Service Plans." (*See* Contract § 5.1.4.1). The Court disagrees. If the Critical Systems section were a subsection of Contingency Service Plans, it would be numbered § 5.1.4.1.4, instead of § 5.1.4.2. At any rate, included within Shaw's responsibility for Critical Systems are "electrical systems." (Contract § 5.1.4.2). As previously noted, Private Van Ryan Marcum was fatally electrocuted when

various electrical system failures energized the metal latrine at the Malone 14 Range of Fort Benning.

Upon careful review of the Army Contract, the Court is satisfied that Shaw's duty to inspect, repair and maintain structures at Fort Benning, including the metal latrine at issue in this case, is not limited to tasks documented in a specific SOO, SO or IJO. Shaw had the ability generate its own work orders once it knew of problems at Fort Benning. Shaw repaired faulty circuit breakers at several latrines on various firing ranges at Fort Benning in the 2 years prior to Van Ryan Marcum's death. Shaw had a contract with the U.S. Army that required it to inspect, repair and maintain structures at Fort Benning, including latrines. Finally, Shaw had the duty to keep the electrical systems at Fort Benning operational 24 hours a day, 7 days a week. The Court is satisfied that, as a matter of law, Shaw had a duty to inspect, repair and maintain the Malone 14 metal latrine at issue in this case. Whether Shaw was negligent with respect to this duty is justiciable question of fact appropriate for submission to a jury.

## B. DEMOLITION OF THE MALONE 14 LATRINE

Assuming, *arguendo*, that Shaw's duty to inspect, maintain and repair the metal latrine at the Malone 14 Range of Fort Benning was limited to tasks documented in a specific SOO, SO or IJO, questions of material fact exist regarding Shaw's conduct in demolishing the latrine. Additional background information is needed at this point.

The latrines at Fort Benning typically were built for male soldiers, only. In 1996, the Army began replacing male-only latrines with latrines equipped for soldiers of both sexes. In November of 2003, Earnest Archie, Maintenance Coordinator for the Fort Benning Firing Ranges, created a work order form, known as a "4283" with a job description calling for the demolition and removal

of the metal latrines listed on the R-144 Form. (Doc. 29, Exhibit 5). This work order form was given to Mark Fincher, Chief of Operation and Maintenance Division of Fort Benning, for processing. The work order was then submitted to the Shaw, who entered the job into its own program, called MAXIMO. The original completion date, or "suspense date" assigned to this demolition project was March 14, 2004. The Malone 14 Range was not demolished by March 14, 2004, however. Shaw argues that this project had been assigned to "slow play," which postpones the deadline for project completion. Shaw informs the Court that suspense dates were "not contractually binding deadlines," but rather a "tool to evaluate the timeliness of Shaw's performance." (Doc. 40, pgs. 31, 34). Further, Shaw argues that the evidence is undisputed that "as of June 17, 2004, the Government had indefinitely postponed the suspense date it originally assigned to the IJO to demolish numerous latrines, including the Malone 14 latrine." (Doc. 40, pg. 39). In response, Plaintiffs point to the deposition testimony of Earnest Archie, who denied any knowledge of a delay having been requested for the demolition of the Malone 14 latrine. (Doc. 34, exhibit F, pg. 44, 47). Upon review of the summary judgment record, the Court is satisfied that justiciable questions of fact exist regarding the demolition of the Malone 14 latrine, such that a ruling as a matter of law would be inappropriate.

### C. FORESEEABILITY OF INJURY TO PRIVATE MARCUM

Finally, Shaw argues that even if it was obligated to demolish the Malone 14 latrine, Private Marcum's death was not a foreseeable consequence of Shaw's failure to do so. The Court agrees with Shaw that negligence cannot be predicated on a failure to anticipate the unforseen. *North Little Rock Transp. Co. v. Finkbeiner*, 243 Ark. 596, 420 S.W.2d 874 (1967). As Shaw notes, "if reasonable persons could not differ about the determination of foreseeability on the evidence before

the court, then the issue of foreseeability is a question of law for the court to decide." *McDaniel v. Linder*, 990 S.W.2d 593, 595 (Ark. Ct. App. 1999). The Court does not agree, however, that the evidence in this case is such that reasonable persons could not differ about the determination of foreseeability. As previously noted, Shaw was aware of problems with the electrical systems in several metal latrines at Fort Benning, based on its repair of faulty circuit breakers in latrines in the 2 years prior to Private Marcum's death. Further, Shaw was contractually obligated to maintain the electrical systems at Fort Benning. The summary judgment record reveals that a proper determination of the question of foreseeability requires submission of the issue to a jury. *See Keck v. American Employment Agency, Inc.*, 279 Ark. 294, 652 S.W.2d 2 (1983); *Lee v. Martin*, 74 Ark. App. 193, 45 S.W.3d 860 (Ark. Ct. App. 2001).

## IV. CONCLUSION

For reasons discussed herein and above, the Court finds that Defendant The Shaw Group, Inc.'s Second Motion for Summary Judgment should be and hereby is **DENIED**. An order of even date, consistent with this opinion, shall issue.

**IT IS SO ORDERED**, this 1st day of November, 2006.

                                                 /s/Harry F. Barnes
                                                 Hon. Harry F. Barnes
                                                 United States District Judge